Robert Tillman DUGGER, Appellant,

v.

The STATE of Texas, Appellee.

No. 51933.

Court of Criminal Appeals of Texas.

Nov. 10, 1976.

Rehearing Denied Dec. 8, 1976.

Robert T. Baskett, Dallas, court appointed, for appellant.

Henry Wade, Dist. Atty. and Steve Wilensky, G. Norman Kinne and Hugh Lucas, Jr., Asst. Dist. Attys., Dallas, Jim D. Vollers, State's Atty. and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

KEITH, Commissioner.

The appeal is from a conviction of murder where the jury fixed the punishment at confinement for life. A statement of the underlying fact structure is needed to place appellant's complaints in focus.

On Sunday morning, February 3, 1974, Tommy Galbraith left home about 7:30 to serve National Guard duty, leaving his wife Vicky and infant daughter Tammy at home. He returned about 9:30 with several fellow guardsmen to get his motorcycle for use during the day. He went into his house, briefly noting that Vicky was wearing a blue bathrobe and yellow bikini panties.

About this time, Becky Clark visited appellant's stepdaughter Teresa at appellant's home and Becky then saw appellant in his garage next door to the Galbraith home. Around 10 a. m., ten-year-old Rodney Harris, playing at his home across the street from the Galbraith residence, saw appellant knocking on the Galbraith front door but did not see appellant enter the house.

Sometime shortly thereafter, Becky Clark and Teresa were engaged in throwing a frisbee in appellant's backyard when it was thrown accidentally into the Galbraith backyard. Becky went to the front door intending to seek permission to go into the backyard to get the frisbee; but, when she rang the bell, no one answered although she did hear movements in the house. Becky and Teresa were playing another game in Teresa's backyard when she noticed the closed blinds on the Galbraith house begin to shake, at which time they broke up their game.

About 11:30, appellant returned to his home appearing to be visibly shaken and upset. He left in his car about fifteen minutes later.

Around 2:30 in the afternoon, Galbraith returned home with two guardsmen, Keith Barber and Guy Senter, who began unloading the motorcycle while Galbraith went inside to greet his wife. He emerged almost immediately screaming and stumbling from the house.

Barber and Galbraith removed the infant Tammy from the house and returned to survey the scene. Vicky's nude body was found upon the bed, her robe having been torn and her panties removed. Her hands were tied behind her back with a cord which was wrapped around her neck in such manner that if she moved her arms, she would choke herself. An ax handle which Galbraith kept around the house for protection was found near the bed. Dallas Police Officer Jerry Debenport testified that Vicky's head was mutilated almost beyond recognition; the ax handle and bed were covered with blood and the walls and ceiling of the room were splattered with blood.

Appellant's fingerprints were lifted from the headboard of the bed in which Vicky was found; and, we note at this point that Galbraith testified that appellant had never before been in the house.

Medical Examiner DiMaio testified that Vicky died from massive injuries to the head and neck as well as stab wounds, one piercing the liver and the other causing hemorrhaging into the lung cavity. The examiner also found live male sperm in the deceased's vagina.

Appellant did not testify at the guilt/innocence stage of the trial but did testify upon the penalty hearing making a judicial confession that he had murdered Vicky Gal-

braith. He testified that she had seduced him upon two prior occasions and he had had sexual intercourse with her in her home during her husband's absence; that on the day of the murder, she again enticed him into an attempt at sexual intercourse but, when he was unsuccessful in his attempt, she threatened to accuse him of rape. Since he had been convicted of felonies at least five times earlier, he knew that if she did so, he would be sentenced to life in prison. Incredibly, he testified that he felt no remorse for his actions. Having heard appellant's confession of his crime, the jury quickly assessed the maximum punishment which the State sought.

Appellant was arrested the night of the murder and eight days later one of the District Judges in Dallas County appointed counsel to represent him although the indictment was not returned until February 25, 1974. As early as March 6, 1974, appellant wrote to the trial judge complaining of appointed counsel's failure to confer, etc., and sought his discharge and the appointment of another named individual as his attorney. He kept making requests at frequent intervals preceding the commencement of his trial on January 13, 1975.

The primary thrust of the brief filed by his newly appointed counsel upon appeal is that the trial court erred in refusing to discharge his originally appointed counsel and refusing to permit appellant to represent himself without assistance of counsel. Counsel relies primarily upon *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (June 30, 1975), which was decided approximately six months after the completion of the appellant's trial. Thus, initially, we note that the Supreme Court did not specifically declare that the holdings in Faretta were retroactive and counsel has not cited us to an authoritative case which so holds.

Counsel has presented us with an excellent brief which covers the right to represent one's self in a criminal case. We have studied carefully all of the several handwritten complaints filed in the trial court which complain of counsel and are unable to determine that appellant ever at any time actually sought the entry of an order discharging his counsel and permitting him to defend himself without assistance of counsel. The closest appellant ever comes to bringing himself within the *Faretta* doctrine is by asking the discharge of his court-appointed counsel without requesting that another be appointed.

■ Although counsel bases a large portion of his argument upon the instrument which appellant entitled "Motion and Notice of Retainment [sic] of Power of Attorney", a reading of the document leads to the belief that appellant was demanding his right to be present at any time someone was acting in his behalf, and not for the right to defend himself.

On the day of trial, the court disposed of all of the pending motions which had been filed by appellant's counsel as well as the pro se motions appellant had filed. When he came to the one mentioned earlier, this colloquy is to be found in the record:

"[THE COURT]: You have a Motion and Notice of Retainment [sic] of Power of Attorney.

"I think I understand you don't want anything Mr. Ballew does to have any effect on you; is that what you are saying?

"THE DEFENDANT: In other words, anything that he does, he goes through me to do it, that affects my case, such as signing any kind of statement, affidavits or any—

"THE COURT: There is nothing that your lawyer can do without your signature, Mr. Dugger, that waives any of your rights or binds you in any way in a criminal court; maybe in a civil court, but not a criminal court."

We agree with the State's counsel in concluding that this particular motion does not invoke the *Faretta* doctrine.

We have examined the record carefully in view of appellant's severe attacks upon the competency of his appointed counsel and disagree with the contentions now advanced. On the contrary, a review of the

record indicates that appellant's trial counsel discharged his duties to his client in accordance with the traditions of our bar. It would lengthen this opinion unnecessarily to spell out each detail of appellant's complaints against his counsel. In the very recent case of *Ex parte Prior*, 540 S.W.2d 723, 726–727 (Tex.Crim.App.1976), Presiding Judge Onion dealt with many of the cases on the subject.

■ We do not find it necessary, and consequently decline, to take up each instance of ineffectiveness alleged in appellant's brief since the quality of representation is to be judged by the " 'totality of the representation.' " *Stutes v. State*, 530 S.W.2d 309, 314 (Tex.Crim.App.1975). As in *Stutes*, supra, the record shows that appellant's appointed counsel filed many pre-trial motions, cross-examined the State's witnesses extensively, and put appellant's stepdaughter upon the stand. After appellant elected to take the stand and testify in the punishment phase of the trial, it is apparent that appellant's counsel had little to work with in presenting a defense.

We find, from our study of the record, that appellant was not denied effective assistance of counsel. *Ex parte Gallegos*, 511 S.W.2d 510, 512 (Tex.Crim.App.1974). See Note, 6 Tex.Tech L.Rev. 1155 (1975), commenting upon *Gallegos*.

Appellant's judicial confession, made at the punishment phase of the trial, has mooted many of the questions so diligently presented by his counsel. When he testified that he killed Vicky Galbraith under the circumstances we have mentioned earlier, appellant removed from the case all question of the sufficiency of the evidence to sustain the conviction. *Boothe v. State*, 474 S.W.2d 219, 221 (Tex.Crim.App.1971). *Accord: Garcia v. State*, 522 S.W.2d 203, 205 (Tex.Crim.App.1975); *Jones v. State*, 518 S.W.2d 245, 247 (Tex.Crim.App.1975); *Sims v. State*, 502 S.W.2d 730, 731 (Tex.Crim.App.1973); *McKenzie v. State*, 487 S.W.2d 65, 66 (Tex.Crim.App.1972); *Brown v. State*, 487 S.W.2d 86, 87 (Tex.Crim.App.1972); *Sheridan v. State*, 485 S.W.2d 920, 921 (Tex.Crim.App.1972); *Evans v. State*,

480 S.W.2d 387, 390 (Tex.Crim.App.1972); *Chaney v. State*, 477 S.W.2d 580, 581 (Tex.Crim.App.1972); *Palmer v. State*, 475 S.W.2d 797, 798 (Tex.Crim.App.1972); *Richardson v. State*, 458 S.W.2d 665, 666 (Tex.Crim.App.1970).

Any complaint appellant may have had as to the adequacy of his representation by appointed counsel was waived when he made a judicial confession of the offense with which he was charged. Thus, his confession rendered the error, if any, harmless beyond a reasonable doubt. *Hunnicutt v. State*, 531 S.W.2d 618, 622 (Tex.Crim.App. 1976).

Moreover, as stated in *Rozell v. State*, 502 S.W.2d 16, 18, footnote 1 (Tex.Crim.App. 1973): the appellant having testified at the penalty stage of the trial that he was guilty, "[h]is testimony could be introduced in the event of another trial", with the court citing *Richardson* and *Boothe*, supra.

All grounds of error complaining of the adequacy of the representation by appointed counsel, and ground of error number six complaining that "the admissible evidence is insufficient to support the verdict," are overruled.

■ In his fourth ground of error, appellant claims that the trial court erred in admitting photographs of the body of the deceased taken at the scene of the murder because they were inflammatory and calculated to incite the emotions of the jury and would not tend to solve any relevant or material issue. Having examined the several pictures introduced showing the wounds upon the body of the deceased, we find that such simply graphically represented what they purported to depict. Appellant asks us to overrule the rule established in *Martin v. State*, 475 S.W.2d 265, 267 (Tex.Crim.App.1972):

"If a verbal description of the body and the scene would be admissible, a photograph depicting the same is admissible."

Counsel suggests that we should abandon the rule set out in *Martin*, supra, and return to the rule which prevailed before *Burns v.*

*State,* 388 S.W.2d 690 (Tex.Crim.App.1965), was overruled by *Martin.\**

The rule enunciated in *Martin,* supra, has now become firmly entrenched in our jurisprudence. See, e. g., *Lopez v. State,* 535 S.W.2d 643, 651 (Tex.Crim.App.1976):

> "There was testimony of the condition of the deceased's body at the scene. It is well established that since a verbal description of the body and the scene was admissible it is not error to admit into evidence photographs thereof. *Sloan v. State,* 515 S.W.2d 913 (Tex.Cr.App.1974); *Self v. State,* 513 S.W.2d 832 (Tex.Cr.App.1974); *Winegarner v. State,* 505 S.W.2d 303 (Tex.Cr.App.1974); *Martin v. State,* 475 S.W.2d 265 (Tex.Cr.App.1972)."

See also, *Sternlight v. State,* 540 S.W.2d 704, 707 (Tex.Crim.App.1976), where other decisions, also following the *Martin Case,* are cited.

We decline appellant's invitation to overrule *Martin* and resurrect *Burns;* and, so holding, his ground of error number four is overruled.

■ The fifth complaint brought forward is that the court erred in refusing to declare a mistrial when the husband of the deceased volunteered the testimony that his infant daughter was at the scene of the crime "and saw everything and knows everything." Appellant's objection was sustained and the jury instructed to disregard the statement but his motion to declare a mistrial was overruled. No error is shown. The prompt action of the court cured the error, if any. As said in *Florio v. State,* 532 S.W.2d 614, 617 (Tex.Crim.App.1976), "This Court has often held that an unresponsive answer is cured by an instruction to disregard." Ground five is overruled.

An examination of the few remaining grounds of error in the brief filed by appellant's counsel fails to reveal error and each such ground is overruled. Likewise, we do

not find error to be presented by appellant's pro se brief.

The judgment of the trial court is affirmed.

Approved by the Court.

---

\* This is the language used in changing the rule:

"The former rule in this state, that gruesome photographs are not admissible unless they tend to solve a disputed fact issue as discussed

in *Burns v. State,* 388 S.W.2d 690 (Tex.Cr.App. 1965), is hereby overruled to the extent of any conflict with this decision." (475 S.W.2d at 268)