AMERICAN PLANT FOOD CORPORA-
TION, Appellant,

v.

The STATE of Texas, Appellee.

No. 55602.

Court of Criminal Appeals of Texas.
En Banc.

Sept. 26, 1979.

Rehearing En Banc Denied Oct. 31, 1979.

Thomas S. Terrell, Kerrville, David Speed Elder, Houston, for appellant.

Carol S. Vance, Dist. Atty., Calvin A. Hartmann and Frank A. Perrone, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

OPINION

DOUGLAS, Judge.

Appellant was convicted for the offense of water pollution. The punishment was assessed at a $500 fine.

Appellant, American Plant Food, attacks the sufficiency of the evidence to prove both a discharge into "water in the state",[1] and a discharge into surface water adjacent to the north boundary of its premises as alleged in the information.

On May 30, 1975, Robertson Barrett and James Taylor, investigators for the Harris County Pollution Control Department, conducted an investigation of the Corporation's plant at 903 Mayo-Shell Road in Galena Park. They walked around the perimeter of the plant and discovered a discharge of water and acid from a holding pond on appellant's property which was used for catching and holding waste from appellant's operations. The flow rate was determined to be approximately thirty-five gallons per minute. The discharge went into a large pool extending from appellant's property, under the perimeter fence and onto a field to the north. The field was not owned by American Plant Food and was described as non-commercial property. From there the discharge entered a small drainage ditch which ran north to the northern boundary of the field in question. At that point another source of water flowed into the ditch. The ditch then ran west to Mayo-Shell Road and then south as a roadside ditch. The trial court excluded testimony that the drainage ditch eventually ran into the Houston ship channel.

Barrett testified that field tests showed that the water in the vicinity of the pool

---

1. V.T.C.A., Water Code, Section 21.552(a) [now Section 26.212(a)] provides:

   "No person may discharge, or cause or permit the discharge of, any waste into or adjacent to any water in the state which causes or which will cause water pollution unless the waste is discharged in compliance with a permit or other order issued by the Texas Water Quality Board, the Texas Water Development Board, or the Texas Railroad Commission."

had a Ph of 3.[2] Dr. Michael Terrasco, Director of the Harris County Pollution Control Department Laboratory, testified that samples of discharge had a Ph of 2.4 which he considered very acidic and harmful to all forms of life. The water which entered the ditch at the northwest edge of the field had a neutral Ph of 7 and after that point the Ph in the ditch was 5 and continued to be 5 as the ditch ran along Mayo-Shell Road. Although most of the field was covered with chest high vegetation, there was no vegetation or other life forms growing in the vicinity of the polluted water. In fact, Barrett stated that he had found only dead one inch long water bugs in the water. Barrett also testified the ditch always contained water and was four feet wide and two to three feet deep. There was, however, no permanent pond or lake in the field.

V.T.C.A., Water Code, Section 21.003 [now Section 26.001] defines water and waters in the state as follows:

"(3) 'Water' or 'water in the state' means groundwater, percolating or otherwise, lakes, bays, ponds, impounding reservoirs, springs, rivers, streams, creeks, estuaries, marshes, inlets, canals, the Gulf of Mexico inside the territorial limits of the state, and all other bodies of surface water, natural or artificial, inland or coastal, fresh or salt, navigable or nonnavigable, and including the beds and banks of all watercourses and bodies of surface water, that are wholly or partially inside or bordering the state or inside the jurisdiction of the state."

Section 21.551 [now Section 26.211] further defines water as:

"(1) 'Water' includes both surface and subsurface water; and 'water in the state' means *any* water within the jurisdiction of the state." (Emphasis added).

██ Viewing the evidence in the light most favorable to the verdict, we hold it is sufficient to prove a violation of Section 21.552, supra, as alleged in the information. The evidence shows that the pollutant escaped from American Plant Food's premises onto the adjacent field. It formed a large pool and then flowed into a drainage ditch. This drainage ditch contained not only waste from the factory, another stream of water also flowed into it from the northeast. The water in this stream had a neutral Ph of 7 until it combined with the very acidic solution discharged by appellant. The water polluted was not merely that in the pool formed by the discharge but all the water in the ditch and that flowing into it. It is readily apparent from the above broad definitions that this drainage ditch water is one of the types of surface water the Legislature sought to protect, and we so hold. Although there was testimony to the effect that the ditch occasionally contained only stagnant water, a careful reading of Section 21.003(3) reveals that it makes no distinction between perennial and intermittent streams. Indeed, by including ponds, marshes, lakes, canals, "and all other bodies of surface water . . . including the beds and banks of all watercourses", the Legislature sought to prevent the kind of pollution evident here.

██ Next, appellant contends that the court erred in overruling its motion to quash because the information does not allege "water in the state." The information in pertinent part reads:

"Did then and there unlawfully discharge and cause and permit the discharge of, industrial waste and acid into and adjacent to waters in the State, to-wit: Surface water adjacent to the north boundary of Defendant's premises at 903 Mayo-Shell Road, Galena Park, Harris County, Texas, and flowing then into surface water adjacent to Mayo-Shell Road in Galena Park, thereby causing the alteration. . . ."

The information alleges water of this State. It would take a strained construction to hold to the contrary.

**2.** The lower the Ph below 7, the more acidic the liquid.

Appellant complains that the court erroneously refused to grant its requested definition of "water in the state." The court's charge tracked the language of Section 21.551(1) [now Section 26.211(1)] verbatim. This instruction was sufficient.

The contention mentioned for the first time in the appellate brief that the charge also constituted an unlawful comment upon the evidence was not objected to at the trial. Consequently, nothing is presented for review. *Duncantell v. State,* 563 S.W.2d 252 (en banc) (Tex.Cr.App.1978); *Brock v. State,* 556 S.W.2d 309 (Tex.Cr.App. 1977), and cases cited therein.

Appellant urges that the State failed to prove a discharge of industrial waste.

Section 21.551 defines "industrial waste" as:

". . . waterborne liquid, gaseous, solid, or other waste substances or a combination of these that result from *any* process of industry, manufacturing, trade, or business." (Emphasis added).

American Plant Food manufactures fertilizer, uses and stores sulfuric acid in the processing of the fertilizer, and the pond in question was used to store "waste water" from the plant. The evidence was sufficient to prove a discharge of industrial waste.

Appellant attacks the constitutionality of the statute on the grounds that it is unconstitutionally vague. The thrust of its argument is that the wording in the definition of "water pollution"[3] which states, in part, "or to public health, safety, or welfare, or impairs the usefulness or public enjoyment of the water for any lawful or reasonable purpose", is unconstitutionally vague because it is not sufficiently explicit to inform those who are subject to it what conduct will render them liable to its penalties.

In *American Plant Food Corporation v. State,* 508 S.W.2d 598 (Tex.Cr.App.1974), the defendant raised the same contention, and it was overruled. We adhere to that ruling.

Appellant's next contention is that it was error to exclude evidence of the rainfall record for the period of time in question. At trial, defense counsel sought to introduce a local rainfall record accompanied by a purported certificate signed by the Director of the National Climatic Center which stated that the rainfall record was an official publication. The State objected on the ground that the proper predicate had not been laid.

Article 3731a, § 4, V.A.C.S., provides that to be admissible the writing must be attested by an officer having legal custody of the record or by his deputy and, unless the documents are from public offices of this State, the signature of a judge of a court of record authenticated by the seal of his office is also required. The alleged certificate does not state that the signer is the legal custodian of the record nor is it accompanied by the authentication of a judge of a court of record. The court did not err in sustaining the objection. We are not passing upon the admissibility of the record in this case had the proper predicate been made.

Next, appellant asserts that a mistrial should have been declared when the State's investigator, Barrett, testified about similar investigations of appellant despite the granting of its motion in limine on this point.

On direct examination by the State the following exchange occurred:

"Q. Mr. Barrett, you have testified that you have not contacted anybody on the premises on the May—May 30, 1975, the day after that and three

---

3. Section 21.551(2) [now Section 26.001(14)] defines "water pollution" as:

"'Water pollution' means the alteration of the physical, chemical, or biological quality of, or the contamination of, any of the water in the state that renders the water harmful, detrimental, or injurious to humans, animal life, vegetation, or property, or to public health, safety, or welfare, or impairs the usefulness or public enjoyment of the water for any lawful or reasonable purpose."

days after that. My question to you now is why did you not contact anyone?

"A. Uh, the reason I did not contact anyone is that on previous—uh—on previous occasions I have made investigations of this plant and in previous occasions I tried to notify the company and on all occasions I was made to wait in the waiting room for hours at a time; an—uh—I found the plant personnel always met me with hostility and he'd—uh—It was not fruitful to; and then I found that that did not help the problem because the problem continued to exist after I notified them.

"MR. TERRELL: Your Honor, that's the very matter that the Court's been ruling on all this time and I just have to object and move for a Mistrial.

"THE COURT: The objection is sustained. The Jury is instructed to disregard the unresponsive portion of the last answer and the last clause will not be considered by you for any purpose. The Motion for a Mistrial is denied."

An unresponsive answer may be cured by an instruction to disregard. *Dugger v. State,* 543 S.W.2d 374 (Tex.Cr.App. 1976); *Florio v. State,* 532 S.W.2d 614 (Tex. Cr.App.1976). In the instant case the court sustained appellant's objection and instructed the jury to disregard. This was sufficient to cure any harm.

Appellant contends that its motion in limine and to suppress should have been granted because Barrett failed to comply with V.T.C.A., Water Code, Section 21.064 [now Section 26.014].

The testimony adduced at the trial showed that the field adjoining appellant's plant was owned by Southern Pacific Railroad Company and leased by Billy Joe Purser, appellant's plant manager, for his personal use. He paid the rent out of his personal funds. Purser, however, did not live on the property and the only structure on the land was a horse stall containing several animals.

Section 21.064 provided at the time of the offense:

"The members, employees, and agent of the board are entitled to enter any public or private property at any reasonable time for the purpose of inspecting and investigating conditions relating to the quality of water in the state. Members, employees, or agents acting under this authority who enter private property shall observe the establishment's rules and regulations concerning safety, internal security, and fire protection, and if the property has management in residence, shall notify management, or the person then in charge, of his presence and shall exhibit proper credentials. If any member, employee, or agent of the board is refused the right to enter in or on public or private property under this authority, the board may invoke the remedies authorized in Section 21.253 of this code."

The property in question did not have a manager in residence and at no time did the investigators enter appellant's premises. Although appellant subsequently bought the property, this occurred after the incident which gave rise to the charges here. No error is shown.

In a supplemental brief appellant contends that the information is fundamentally defective for failing to allege a culpable mental state. It maintains that V.T. C.A., Penal Code, Section 6.02(b), requires that a culpable mental state be alleged "unless the definition plainly dispenses with any mental element."[4] No motion to quash the information was filed.

In *Ex parte Ross,* 522 S.W.2d 214 (Tex.Cr. App.1975), the defendant claimed that the complaint for the offense of driving while under the influence of intoxicating liquor was defective for failing to allege a culpable mental state. The Court noted that if the Legislature had intended to require proof of a culpable mental state it could

4. See also V.T.C.A., Penal Code, Section 1.03(b).

have easily done so when it amended the statute and transferred it from the penal code to the civil statutes.

The Court held that a culpable mental state was not required to support either a conviction nor DWI or involuntary manslaughter because both may be committed without any sort of mens rea and because it was obvious that the Legislature took note of the strong public policy directed at keeping intoxicated persons off the highways. See *Owen v. State,* 525 S.W.2d 164 (Tex.Cr. App.1976); *Neill v. State,* 225 S.W.2d 829 (Tex.Cr.App.1949) (sale of adulterated meat); *Goodwin v. State,* 63 Tex.Cr.R. 140, 138 S.W. 399 (1911) (speeding).

In *City of Galveston v. State,* 518 S.W.2d 413 (Tex.Civ.App.—Houston [14th Dist.] 1975), the court faced a similar contention with regard to scienter and the civil penalties of the statute. In analyzing the legislative history of both the civil and criminal aspects of the act, the court stated:

"The history of the Texas Legislature's treatment of water pollution control statutes bears a close similarity to the legislative history of Article 6036, involved in the Harrington case. Texas' former water pollution statute, Article 7621d, Tex.Laws 1961, ch. 42, § 10(a), at 156, made it a misdemeanor, punishable by a fine of from $100 to $1,000 a day, for one to *knowingly* violate its terms. On September 1, 1967, Tex.Laws 1967, ch. 313, at 745, became effective and repealed Article 7621d. The later statute, at section 15(a), imposed civil penalties for its violation and omitted the requirement that the violation be knowingly committed to subject one to those penalties. Again, in 1969, the statute was amended and the civil penalties provision, carried forward as section 4.01(d), did not require that the violation be knowingly done. Tex.Laws 1969, Ch. 760, § 1, at 2229. Finally, the statute was amended again, effective September 1, 1971, by enactment of the Texas Water Code. The civil penalty part of the statute became the above quoted section 21.252, which does not, by its literal language, require knowledge on the part of the violator to impose the provided for civil penalties. Also, at Section 21.553, the misdemeanor penalty has been carried forward with the deletion of the 'knowingly' requirement that was a part of the statute before 1967.

"The City argues that this legislative history as to the deletion of the 'knowingly' element relates only to the misdemeanor penalty provision. There was no civil penalty provision in the water pollution statute before its amendment in 1967. But the statute before and since 1967 dealt with the subject matter of water pollution. The fact that the Legislature before 1967 required knowledge as an element for the imposition of misdemeanor penalties and thereafter has not required such element for the imposition of penalties, either civil or misdemeanor, is persuasive that its intent in the enactment of Section 21.252 was that knowledge or intent to violate not be required for the imposition thereunder of civil penalties. The case of *Williams v. State,* 514 S.W.2d 772 (Tex.Civ.App.—Beaumont, 1974), also supports our holding that no proof of scienter is necessary for the assessment of penalties against the City."

We, too, are persuaded that the Legislature's intent in no longer requiring proof of knowledge when it amended the act in 1967 was to create a strict liability standard in which no proof of scienter is necessary. If the Legislature had intended to require proof of a culpable mental state for this crime, it would have been much easier to merely include the requirement by amending the statute when it was transferred to Section 21.552 of the Water Code in 1971 and when it was retransferred to Section 26.211 in 1977. As the Court noted in *Ross,* "[I]t seems strange that they would implement the same in the awkward manner the petitioner suggests." The concept of strict liability is founded on the premise that the mere doing of the act constitutes the offense and the lack of intent "will not exonerate the party nor does this make the prohibited act any less harmful to society." *State v. Arizona Mines Supply Co.,* 107 Ariz. 199, 484 P.2d 619 (1971). See *Hindman v.*

**686**

*E.P.A.,* 42 Ill.App.3d 766, 1 Ill.Dec. 481, 356 N.E.2d 669 (1976); *Department of Health v. Concrete Specialties, Inc.,* 112 N.J.Super. 407, 271 A.2d 595 (1970). The Legislature in eliminating a mens rea element recognized the substantial risks to public health involved in even passive pollution and enacted the penal section of the Water Code in this manner to further its intent. No error is shown.

The record contains no reversible error. The judgment is affirmed.

ONION, P. J., and ROBERTS, PHILLIPS and TOM G. DAVIS, JJ., dissent.